Alvarado v. Corporate Cleaning Service Mr. Werman Good morning. May it please the Court, Doug Werman for the Plaintiffs Appellants. Plaintiffs were entitled to judgment on the Fair Labor Standards Act and Illinois Minimum Wage Law claims for two primary reasons. First, the District Court conflated the difference between job rate and commission rate compensation plans. And in doing so, the Court applied an overly broad and legally incorrect test in not requiring defendant to prove that it paid plaintiffs' commissions based on the application of a bona fide commission rate. The defendant had no plan that identified ex ante or ex post the percentage that plaintiffs would be paid from any customer sale, and the District Court disregarded the evidence that demonstrated... But isn't the critical point that these window cleaners, window washers, are working irregular hours? So sometimes they work more than 40 hours a week. Other times they take weeks off in the winter and so on. And isn't that the point of the commission provision of the Fair Labor Standards Act that there's no reason to give these irregular hour workers overtime because they have just decided and they really like this flexibility so they work more than 40 hours some weeks, don't work at all other weeks, and that's how they like to do things. And it would be windfall to give them overtime. No, Judge. If they take weeks off and they don't do any work at all, why should they be getting overtime when they do work? If it all comes out to 2,000 hours a year, why should they have an advantage over workers who work a steady 40 hours a week? Judge, the record evidence was not that they were taking weeks off at a time. Someone who goes to Mexico in the winter for a couple of months, takes months off? There's no record evidence that individuals, plaintiffs, were going to Mexico for months at a time. Many workers in the United States take a vacation. And these workers may be no different, that they might take a week or two off. But the record evidence was quite clear that corporate cleanings business, they were always busy. They were always what? They were always busy. Always busy? The company was always busy. And there was always work. They were not being infested by the falcons. The defendants like to say that the work might be interrupted by falcons, Judge. But that was acute fact in the evidence. That was a what? That was acute fact that was presented by the defendants as part of the record evidence. But the truth of it is... Did you say acute fact? Yes, Judge. But the truth of it is that the plaintiffs worked a significant number of hours and they worked a significant number of hours year round. But there are certain weather conditions in which they can't work. There are weather conditions in which the plaintiffs were not able to work. And in Chicago that can be for an extended period of time, right? It can be. But the testimony at trial was that when the weather turned bad, there certainly would be days they would not work. But the company was able to find work for employees washing the interior of windows. Wouldn't that be a little bit different of a volume? For instance, in the summer or whatever, when the weather is good, I was raised on a farm and said, you make hay when the sun shines. Same thing here. I mean, I don't live here, but when I walk around town and I look at these tall buildings, I realize that there's a lot of work that might have to be done. But there's a lot of variation in each of those buildings. But as far as the time, I didn't really study all of the record, but it would seem that in the wintertime there's going to be smaller crews. There's still work to be done, but it's not the same volume as when the weather is good. There's less volume of work to be done in the wintertime, but there was no record evidence that during the winter months employees were still not working overtime. Is everybody, is the full crew working all? Or does the crew diminish when the weather is bad? I don't know if that's clear. It's logical to me. That's why I ask that. It just seems that there's a lot of times when it's 15 degrees and windy, you don't want to be hanging up there on some staff. Judge, it's logical. Agreed. So maybe there are some buildings that are easier to work on in that situation, and maybe they would still work in the winter. But I think what the other judge was asking, there's no consistency here, and therefore it's difficult to measure overtime on a normal basis. Well, what we're talking about is that there was a problem in terms of being able to track or record the number of hours that the crews were working each day and each week. That was no problem, because the crews would report to the company in the morning. They would need a report before they would start a building. They would end the day. They would return to the company. So in terms of completely unsupervised, and there's an issue in terms of the number of hours that they're working. Of course, it's the employer's obligation to record and keep accurate records. Is your claim that these people are working more than 2,000 hours a year? Yes, Judge, they work more. What's the evidence of that? Well, the evidence of it is largely testimonial evidence in terms of the numbers of hours that they work. I mean, the company could have kept precise records, of course, of the number of hours that the employees didn't. And because they don't have the exact number of hours, the Mount Clemens standard is going to apply in terms of... What is the testimonial evidence? Well, we had one plaintiff testify at trial, and he testified to the number of hours that he was working on a daily basis. But there's not, I don't believe that there is significant or really any record evidence as to the exact number of hours that the plaintiffs were working each year. But what this appeal raises, at least on the commission side, and of course in order for the defendant to be even entitled to take the commission exemption, they also have to be a retail and service establishment under the Act. And that's the other component of the appeal. We claim that... What is a service establishment and is it distinct from a retail establishment? Well, a service establishment is providing services like window washing into the stream of commerce. I don't know exactly what the distinction is for purposes of the statute. Well, doesn't that mean that you're much more likely to have irregular hours with the service establishment? You're providing a service. Someone needs a service. That's different from, you know, where you can work creating inventory for some future sales, right? So if some building just got splashed or something and the windows are filthy and they're having a big meeting there, they want to get it clean, it has to be cleaned immediately, right? So some workers, some window washers may have to work overtime. But if they're compensated by being, you know, given weeks off, they end up working no longer hours in a year and then why would they get overtime? It would get overtime quite candidly because I think the statute requires... No, the statute, remember, it talks about a service establishment. And if this is a service establishment, you can see, you know, why to think of it in commission terms as people who work when they have to work, but they're not working, you know, 9 to 5, then why wouldn't they fall under the exemption? Well, the Department of Labor has longstanding regulations in terms of, that define what kind of establishments are retail and service establishments for purposes of the 207I exemption. And those interpretations and regulations have been on the books since 1941. Well, are you saying this window cleaning company is not a service establishment? It is a service establishment, Judge, but it's not a service establishment. It provides a service, but it is not a retail and service establishment for purposes of the 207I exemption. Why not? Because it has the attributes, Judge, of a wholesaler and not... No, it's not a wholesaler. Judge, when you look at the kinds of purchasers of its services, when you look at the price and the quantities in which its services are provided, it's doing everything supersized. I don't see how you can describe it as a wholesaler. It's not selling something for resale. It is selling something for resale because its customers are not me. They're not any individual. I cannot return to my office after court and call the defendant and ask it or hire it to clean the window of my office suite or even my entire building. The only entity or person that can do that is a property management company who contracts with defendant. Wait a minute. You just said the difference between an individual office or the whole building, and I think there's a big difference. Let me be more clear. I'm sorry. The only people, the only persons that hire defendant to perform services are property management companies, building owners, and they then resell... Wait a minute. You said property manager and building owner. Condo associations. I think a building owner is the one who's going to pay. The building owner, what happens is the property management company, for example, will hire a defendant to wash the entire building, and the price or the cost of defendant's services are then passed or resold to the tenants in the form of rent or special assistance. No, I'm not clear on that. You say the property management, okay, they hire to have the whole building washed, cleaned. Yes. And as I look through town, even this morning, I don't normally gaze. I'm not from here. I live in South Bend and we don't have tall buildings. The only one that's tall is falling apart. But I notice how much different each building is and how it would take a different calculation for each building. And what I'm trying to figure out is if it's... There's only one customer and that's whoever owns the building or controls the building, and that's who's going to pay. That's why I look at a retail as one big customer. And I just don't see where you're trying to bifurcate this with making a wholesaler, I guess what they call a manager, and the owner. It's a tripartite kind of business relationship where there's the vendor, there's the buyer, and then there's the tenant. And so the vendor is corporate cleaning service. Vendor is who? The defendant in this case, the corporate cleaning service. And their window washing services are being bought or paid for by the property management company who then resells or really resells the cost of those services. That's strictly an agency relationship. Whoever it is that lines it up for the owner, the owner pays. Well, the appellate decisions that have addressed similar kinds of relationships have actually held similar... Look, here's what you're arguing which is totally untenable. Suppose I'm in the trucking business. And so I buy a truck from some automotive company. And of course, since I'm in the trucking business, this is a business expense, when I charge for transporting stuff and so on, I'm trying to recover the cost of the truck. But that doesn't mean that the automotive company that sold the truck to me is a wholesaler because as the buyer, I'm going to actually try to recover the cost in my Look, it's the same thing. The company sells a truck to someone who's in business and he's going to try to recover the cost of the truck in dealing with his customers. And that's just like the property management company which is paying for these window washers. And sure, this is going to be reflected in rental and so on. But that doesn't make the window cleaner a wholesaler. Well, the... Judge, I don't agree. The Department of Labor... Do you think that in my truck example the automotive company is a wholesaler? I think that if... Well, yes or no. Answer my question, yes or no. In your example, it is more akin to a retailer. Why? Because of the price, who the purchaser is, the price and the quantity in which the good is being sold. But corporate cleaning doesn't sell the washing of one window or one floor of a building. It's selling the sale of an entire building. In fact, more than thousands of trucks. And almost all of those trucks are used in the business. So why is that any different from the window cleaners selling to building managers? It may, depending upon if those trucks are being resold and what volume. Nobody has ever argued that because you sell to businessmen you're a wholesaler. Judge, it's been our position in the case that all of the evidence, the testimonial, the documentary and the statistical mathematical evidence demonstrated that there was not a bona fide commission rate, that the plaintiffs were not paid commissions based on the application of a bona fide commission rate. And so I appreciate the court's concerns about fluctuation in hours of work, but a opportunity to talk about that. But that's the key issue, one of the two key issues in the appeal. And what the mathematical evidence shows is that plaintiffs were paid fixed amounts, that defendants varied those, that plaintiffs were paid fixed amounts, but defendants varied customer charges wildly. And that's the essence of a job rate compensation plan. In job rate compensation, I know you've got your red lights on. I just want to clear up this issue. I don't see the resale. I don't care whether it's the building manager or the owner of the building or whoever, when we're talking about there's not a resale. And that's what's confusing me here. There's one buyer, and that's the building owner, manager, whatever you want to call it. There's one buyer, and then those services are then being resold. I don't get the resale. How are they resold? They're resold in the form of the property management company. It's not the service that's resold. Pardon me? It's not the service that's resold. It's not that the window cleaner comes in and says, okay, now we cleaned your windows, and here's our mop, and here's our brush, and so on. So you can go clean them even cleaner. Well, there's the 3rd, the 4th, the 5th, and the 9th Circuit have all addressed situations very similar to this one, and all have found that the service is for resale or the good is for resale. And all those cases are cited in the Department of Labor's amicus brief and our brief as well. Thank you. Thank you. Thank you very much. So Mr. Levin? Good morning. May it please the Court. Ira Levin for the defendants. To one of the earlier questions, Your Honor, on page 28 of the trial court's decision, the evidence showed that during the winter months when business is slow, many window washers return to Mexico. Then, in the spring... Well, your opponent denied that. He said there was no evidence anyone went back to Mexico. That's part of the record, Judge, and that was established at the trial. So someone testified that he went back to Mexico? That's correct. And in addition to that, when they return, the plaintiff, the representative himself, Mr. Alvarado, said he preferred to work longer days when the weather conditions were good, which is a hallmark of this type of system in order to make up for the hours when business is slow. And certainly I think it's rather obvious in Chicago, it's a seasonal job for cleaning, especially the outside of buildings. Well, the days are longer in the summer, I guess. That's true as well. So that's where the variable comes in, I guess. Well, the weather conditions are certainly a major factor in Chicago, and even during parts of the spring, summer, there are wind factors or other factors that prevent cleaning, and sometimes buildings won't allow you to get there until 9 o'clock in the morning. A condominium building, for example, won't allow that to start until a certain time of the day. So there are a lot of variables which affect the ability to work and the time to work. What the cases have said, especially this circuit, is the hallmark of this type of system is that seasonality as well as the decoupling of the actual time you work versus what you're paid. And what the evidence showed at the trial was that these workers are in fact paid on an incentivized basis. They're assigned a certain number of points for a job. Those points equate to dollars per hour on their union wage, but they often work, and the plaintiff in fact testified to this, less hours than it actually takes them to complete the job. So if you have 10 hours worth of pay and you only have to work 5 hours worth of time, it incentivizes you to go to the next job, the next building. But all of those are connected to whether or not you have a job or a sale to go to. And that is the basic premise of a commission system, that it's based upon a sale. It's not like... The collective bargaining agreement here has an overtime provision, right? The collective bargaining agreement had a piece rate section and it mentioned overtime wages, but the trial court specifically said no one from the union ever sought to enforce that, and there was no grievance ever brought to that. With pay documents, your company provides they indicate that you're entitled to overtime as well, don't they? The document reflects a comment to that effect, Judge. Yes, that's correct. But again, whether or not the system is a commission system, there's no definition of the word commission under the Act, and the law says you look at what's actually happening, and the plaintiff himself admits the system he's been paid under all the time he worked there was this commission-styled system. There was a period of time, though, late 07, early 08, when you switched to an overtime system. Some of the plaintiffs in this case decided during the case that they would not work on the commission-based system, and they went to an hourly system, which in fact then carved out some of those, and they were paid differently than the rest of the workers within the company. That also was one of the issues that skewed this price-per-point analysis, this statistical analysis that we went through in the trial court with Judge Chang, along with other principled reasons for the adjustments to how we priced our customers. But the trial court was very clear in finding that the testimony of our three witnesses was credible and consistent in demonstrating that the company has used its point system in good faith to both calculate worker compensation and customer charges, and they were credible in explaining the variations in those final customer charges, which were dictated by real-world conditions. Is the union a party, or has it taken a position in the case? The union is not a party, and the union has not taken a position in the case. Which union is it? Local 1. Of? Service union. Service workers, I believe. I didn't hear you. Local 1. Of? What union? Judge, I may misspeak. I'm not certain. Okay, it doesn't matter. Let me ask you about the Falcons attacking the window cleaners. Is this a seasonal thing? Is it when the Falcons are building their nests or something like that? Judge, I only know that at the trial itself there was some testimony that it has happened on occasion. I'm not familiar with the patterns. So would there be days maybe when they're worried about the Falcons, and therefore they work less or they take the day off? I'm just curious. It seemed an odd thing. Yes, Judge. I don't know that there's any pattern. It's when they have a nest and they're young and it erates. I would imagine so. It's that period of time. I would imagine so, but Judge, I'm not familiar with the pattern. Okay, so there's no evidence about the nesting? There was not. Weather conditions were really the primary issue that related to that. I'm curious about this resale concept, and your opponent cites these other circuit cases including the plumbing, heating and air conditioning case out of the Fifth Circuit. What's your response to that? Well, I think the answer to the question is, is it wholesale? And there's no description of this type of service. We go in and wash windows for a price. If you have a property manager that is the conduit through which you get hired, that cost gets passed on to a building owner. If a building owner doesn't like the service they call, and you have to come back out, but it is connected to or a pass-through to the people who live in those buildings. Judge Dow did a very thorough examination of all the issues with respect to retail within one of the first rulings in the case and went through that process, and there are pest control service examples, computer or cable installation examples of that, cases that we've cited in our briefs, but there's no evidence that there's any reselling of what we do, which is wash windows, which serves the everyday needs of the community. Is it basically then one transaction? Somebody sells and the other pays for it? One serves and the other pays for it? There's not a series of intermediate buying and selling? No, Your Honor. We estimate the job. We look at it in terms of the compensation to the workers, and that relates to how we price it out to the customers, and ultimately if we get the job, we invoice the customer for that particular job. You invoice the person who makes the decision to wash the windows? I'm sorry, I didn't hear. The person who makes the decision to have the windows washed is the person who's going to pay for it? Yeah, the property manager who acts on behalf of the condominium association. He's an agent. Correct. I don't know who writes the check, but there's only one. That's correct, Your Honor. I think just in looking at these cases, I think this court in Meckman talked about it, and I thought it was really applicable here. The presumed narrow construction of the exemption is at best a tiebreaker in very close cases, and not even that if some offsetting canon of construction is in play as it normally there will be. The district court here, after a trial, did not find this to be a to hours worked, incentivized pay, seasonal employment, pay based on sales. These are not low-income wage earners that the FLSA is trying to protect. They're unionized, well-paid workers. There was no evidence of any substandard conditions that existed in connection with these jobs, and the workers were paid what they got paid, which was substantial. I have nothing further unless the court has a question. Thank you very much, Mr. Lovett. Mr. Werman, do you have anything for your time? Mr. Barabas, you can have another minute. Judge, really it comes down to whether or not the plaintiffs were paid on a job rate basis or commission rate basis. While it's true that all commissions are decoupled from hours of work, not all wage payments are decoupled from hours of work. Job rates are also decoupled from hours of work. Job rate workers are entitled to overtime pay. It's true that all commissions are based on sales, but not all wage payments based on sales are commissions. Job rates are also based on sales. So how does one distinguish between them? Because a job rate worker receives a fixed amount of compensation regardless of the sales price. The job rate worker doesn't care about how much the sale ultimately is for. Well, they get paid more if they work faster. Is that what you mean by piece rate? Commission rate workers and job rate workers, their compensation is both a function of their output. So that's not really the difference. The difference is that a commission is a bona fide commission rate is a compensation that's paid based upon a consistent application of a plan. If you put in two variables into the plan, you're going to get the same result every time. The same two variables is going to result in the same commission. The evidence in this case undoubtedly shows that that was not... Well, in Section 207G of the FLSA, it's quite expressed that... A reason. Is there a reason for this difference? Well, I don't know that I can explain what the functional difference is between treating a job rate worker and a commission worker. Some of the other hallmarks of commission plans that you identified might be more applicable in a commission type compensation. I mean, one tries to interpret statutes and regulations, so they're not senseless. Yeah, well, agreed. Thank you. If you have no other questions, thank you. Thank you very much to both counsel, and we'll move on.